**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------X

JOSEPH STEELE,                          :

              Petitioner,       :

                               :

      -against-                   :

                               :

UNITED STATES OF AMERICA,       :

                               :

              Respondent.       :

-----------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: June 4, 2021

**15 CR 836 (VM)**
**20 Civ. 1151 (VM)**
**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge:**

On October 28, 2016, petitioner Joseph Steele ("Steele") was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and (2). Now before the Court is Steele's pro se motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (See "Motion," United States v. Steele, No. 15 CR 836 (the "Criminal Docket"), Dkt. No. 84; Steele v. United States, No. 20 Civ. 1151 (the "Civil Docket"), Dkt. No. 1.) The Government opposes the Motion. ("Opposition," Criminal Docket, Dkt. No. 89, at 9.) For the following reasons, the Motion is DENIED.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

On February 19, 2016, Steele was charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 2. The indictment alleged that Steele had three predicate felonies subjecting him to a sentencing enhancement under the Armed Career Criminal Act,

18 U.S.C. § 924(e)(1). The charges stemmed from an incident that took place on October 10, 2015 in which Steele pulled out a gun and fired it during an argument with three other men. On October 28, 2016, following a four-day jury trial, Steele was convicted of this charge. Steele was sentenced to 180 months' imprisonment, followed by five years' supervised release.

1. The Government's Case

According to the Government's case, Steele pulled out a gun and fired it during an argument with three other men on the corner of West 175th Street and Macombs Road in the Bronx, New York. The Government's evidence included eyewitness testimony that a man in a burgundy jacket pointed a gun at a man wearing a black sweater and a gunshot sounded after the eyewitness turned away. Surveillance video was also introduced, which showed a man in a burgundy jacket brandishing an object in his left hand and pointing it toward the feet of a darkly clothed man in front of him, followed by what appeared to be a muzzle flash from the object.

New York Police Department ("NYPD") Officers Burgos, Pineda, and Guzman drove to the scene of the shooting in response to the eyewitness's 911 call. There, Officer Burgos saw a group of three or four men, with one man standing slightly apart from the others clutching something inside his

jacket pocket. When Officer Burgos ordered the men to stand still, the man holding something inside his jacket pocket -- who the Government contended was Steele -- fled. Officer Burgos gave chase and observed a black object in Steele's left hand. During the pursuit, he saw Steele make a swinging motion across his body with his left hand followed by a metallic clatter coming from the line of cars parked along the sidewalk.

A second group of officers, including Officer Perdomo, intercepted Steele further up the block. After Steele was under control, Officer Burgos returned to the spot where he had heard the metallic clatter and found a loaded .380 semiautomatic pistol between the curb and the tire of a parked car. Officer Guzman testified that he found a spent .380 shell casing near the corner of West 175th Street and Macombs Road. Officer Pineda corroborated Officer Burgos's account and added that Steele had been wearing a burgundy jacket, which he subsequently vouchered at the precinct. The officers' testimony was also corroborated by surveillance footage. Furthermore, a ballistics expert testified that the .380 casing had been fired from the same .380 semiautomatic pistol recovered by the officers that night, approximately twenty feet from where Steele was arrested.

DNA testing of the firearm was conducted, and

criminalist Asako Ishii testified that Steele's DNA was not detected on the gun (though other peoples' DNA was). The criminalist testified about how skin cells and the DNA contained therein may be left on surfaces, noting that some people shed skin cells more than others, some surfaces like metal retain DNA poorly, and environmental factors like application of physical force to the surface by wiping or brushing may affect whether an individual's DNA persists on the surface.

### 2. Evidence Not Introduced

As relevant to the instant motion, three pieces of evidence were not introduced at trial. First is the testimony of Vanessa Martinez, a Forensic Criminalist with the NYPD Police Laboratory, as well as the NYPD Gunshot Residue report Martinez prepared. Before trial, Steele moved to admit this report. Steele sought to introduce the report through the hearsay exception for "a record or statement of a public office." The report concluded that no gunshot residue had been detected on the burgundy jacket worn by Steele.

Upon further discussion with Martinez, the Government learned that Martinez used a low power microscope and not a Scanning Electron Microscope ("SEM"). A SEM is the industry standard tool for identifying gunshot residue because a low-powered microscope can adequately identify residue only on

4

victims' clothing or surfaces actually struck by a bullet. The NYPD laboratory does not use a SEM on clothing due to resource-allocation issues. The Government also learned from Martinez that gunshot residue is not commonly found on the shooter unless the shooter's clothes were burned or singed by the gunfire, and certain materials are more efficient than others at retaining residue. Moreover, environmental conditions and the act of running can easily brush gunshot residue from clothing. The passage of time can also reduce the likelihood that gunshot residue will persist on a surface.

The Government opposed the introduction of the gunshot-residue report because it contained expert opinion that had not been admitted under Rule 702; because it was unreliable in that it failed to disclose serious deficiencies concerning the circumstances of the analysis it purported to carry out; and without the necessary explanation and context from Martinez, admission of the report would mislead the jury and was therefore more prejudicial than probative. The Court agreed that the report was not admissible without the testimony of Martinez as well, a ruling which was affirmed by the Second Circuit. United States v. Steele, 729 F. App'x 47, 49-50 (2d Cir. 2018).

Ultimately, the defense called no witnesses, not even Martinez, even though she was present at trial. Defense

5

counsel explained that he did not do so because "[l]ooking over the record as it came in, I had Ms. Martinez here today, we made a strategic decision not to call her because the record, as I just read it to the Court, allowed me to make that argument about gunshot residue" as part of a larger argument about the inadequacy of the investigation (for failure to do testing at the scene). (Trial Tr. at 304.) The Court rejected the defense's attempt to argue that an inadequate investigation can be inferred based on the failure to do gunshot-residue testing at the scene. The Court concluded that such an inference would be unfair for two reasons. First, the two witnesses the defense sought to rely on, Officer Burgos and Detective Fox, were not experts. Second, the surveillance footage showed officers pursuing Steele and the other individuals present drifting away, so there was no opportunity for the officers to conduct further testing on other individuals at the scene.

The jury began deliberations on October 27, 2016. One of the jury's requests was for clarification on whether the burgundy jacket had been checked for gunpowder residue. While defense counsel argued that the jury should be referred to Officer Burgos and Detective Fox's testimony, the Court ultimately informed the jury that "the trial record contains no evidence in testimony or any exhibit that states whether

or not the jacket was checked for gun powder residue," with the closest testimony coming from Officer Burgos, who said that the jacket "was sent to the lab. I don't know what kinds of testings were done on it." (Trial Tr. at 362-63.)

B.   <u>THE PARTIES' ARGUMENTS</u>

In his Section 2255 motion, Steele alleges that he was denied effective assistance of counsel when his trial counsel (1) failed to call Vanessa Martinez, a Forensic Criminalist with the NYPD Police Laboratory, to testify; (2) failed to call Officer Perdomo to testify about a glove that Perdomo had recovered from Steele following Steele's arrest; and (3) failed to introduce the glove into evidence. Steele contends that had defense counsel called Martinez, the report finding no residue on his jacket could have been introduced. (Motion at 5.) Steele also contends that introduction of the glove, and the related report finding that his DNA was not identified on the glove, would have proven that Officer Perdomo had planted the glove. Steele believes this evidence was exculpatory and would have changed the outcome of his trial in light of the jury's question about whether gunshot residue was found on the jacket, and because casting doubt on Officer Perdomo's credibility would have been enough to sow reasonable doubt of Steele's guilt.

The Government responds that Steele received effective

assistance of counsel and that any alleged errors were not prejudicial. The Government argues that Martinez's testimony would have exposed that the gun-residue test was scientifically flawed, so its conclusion was worthless. Similarly, the Government argues that the testimony of Officer Perdomo regarding the glove and the DNA results would have harmed, not helped, Steele's defense. Because Officer Perdomo was not involved in the collection of the key, direct evidence, such as the surveillance video and the firearm or shell casing, the relevant evidence would not have been affected. Moreover, the DNA analysis only excluded Steele as the primary contributor of DNA on the firearm, but there were multiple unidentified secondary DNA contributors, so Steele could have been a secondary contributor. Given this possibility, the evidence would likely have harmed Steele's defense, because it would have provided an explanation for why Steele's DNA was not found on the firearm. For these reasons, the Government argues that defense counsel's actions were sound strategic decisions that the Court should not second guess, and that in any event, the failures were not prejudicial.

In his reply memorandum of law, Steele argues that Martinez's testimony would have been nonetheless valuable in furthering his inadequate-investigation defense, because the

fact that a purported expert had used a scientifically flawed test suggests that the investigation was subpar. Steele also contends that the DNA report of the glove excluded him as a contributor of the DNA samples found on the glove. Steele further argues that the failure to call experts and admit the scientific exhibits at issue constitutes ineffective performance under United States v. Nolan, 956 F.3d 71 (2d Cir. 2020), and Bell v. Miller, 500 F.3d 149 (2d Cir. 2007).

## II.  LEGAL STANDARD

"In order to establish an ineffective assistance claim, a petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." Cardoza v. Rock, 731 F.3d 169, 178 (2d Cir. 2013). With respect to the performance prong, "counsel should be strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." Cullen v. Pinholster, 563 U.S. 170, 189 (2011) (internal quotation marks, brackets, and citations omitted). While courts are thus deferential to defense counsel's strategic decisions, those decisions must be within "the wide range of reasonable professional assistance." Strickland v. United States, 466 U.S. 668, 689

(1984).

Not all strategic decisions are insulated. The Second Circuit recently held that defense counsel's failure to bring a pretrial motion to exclude eyewitness testimony -- even when done for the strategic decision to impeach the witnesses at trial instead -- was ineffective assistance of counsel, primarily because of the known deficiencies of eyewitness testimony, the Government's heavy reliance on the eyewitness testimony, and the lack of any disadvantage in bringing such a motion. United States v. Nolan, 956 F.3d 71, 81 (2d Cir. 2020). In terms of counsel's failure to call an expert witness to cast doubt on the reliability of eyewitnesses, the Second Circuit recognized that "Strickland ordinarily does not require defense counsel to call any particular witness." Id. at 82. However, the Nolan Court held that the failure to call or even consult an expert about the unreliability of eyewitness identification was ineffective assistance given an expert's ability to identify unreliability "in ways not readily apparent to a lay jury." Id. at 92. Similarly, in Bell v. Miller, the Second Circuit found that counsel rendered ineffective assistance in failing to introduce expert medical testimony to impeach a key witness "without any appreciable downside." 500 F.3d 149, 157 (2d Cir. 2007).

With respect to the prejudice prong, a "defendant must

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Cullen, 563 U.S. at 189 (internal quotation marks omitted). This standard "requires a substantial, not just conceivable, likelihood of a different result." Id. (internal quotation marks omitted).

## III. **DISCUSSION**

The Court is not persuaded that trial counsel was ineffective in failing to call Martinez or Officer Perdomo as witnesses or introduce the glove and its DNA analysis into evidence. Under the circumstances, Steele has failed to demonstrate that these decisions prejudiced him as required for a successful claim of ineffective assistance of counsel.

Officer Perdomo's testimony, the glove, and the DNA analysis of the glove do not raise a "substantial, not just conceivable, likelihood of a different result," Cullen, 563 U.S. at 189 (internal quotation marks omitted), for two primary reasons. First, the evidence does not compel the conclusion that Officer Perdomo planted the glove, as Steele contends. Although the DNA analysis excludes Steele from being "a possible contributor of the *major* component DNA profile obtained" (Dkt. No. 89-1, at 8 (emphasis added)), there was DNA evidence of three individuals on the glove. No conclusion was made "on the minor alleles present," however.

11

(Id.) Thus, Steele was not excluded as a possible secondary contributor, so the jury could still have found that Steele had worn the glove.

Second, and more importantly, introduction of the glove evidence would likely have bolstered the Government's, rather than Steele's, case at trial. Steele's DNA was not found on the recovered firearm. In order to explain away the absence of Steele's DNA on the firearm, the Government introduced expert testimony about how and why DNA is not always fully captured on surfaces. Had evidence of the glove been introduced, though, the Government would have had a much stronger explanation for why Steele's DNA was not found on the firearm -- because Steele had been wearing the glove. For this reason, evidence of the glove created a serious risk of harm to Steele's case. This risk differentiates Steele's case from Nolan and Bell, in which the Second Circuit found no drawback in filing a pretrial motion or calling expert testimony. See Nolan, 956 F.3d at 81; Bell, 500 F.3d at 157. Given the risk of harm to Steele's defense, the Court cannot conclude that exclusion of the glove evidence was prejudicial.[1]

---

[1] The Court is further unpersuaded that the glove evidence would have likely changed the outcome of the trial because even if the jury doubted Officer Perdomo's veracity, the more probative evidence of the firearm and shell casing was collected by Officers Burgos and Guzman. It is thus not clear whether the weight of this evidence would have been affected by

Nor is there a substantial likelihood or reasonable probability of a different outcome had the jury been presented with Martinez's testimony and the gunshot-residue report finding no residue on Steele's jacket. Countervailing evidence would have mitigated any exculpatory effect of this finding. For instance, the Government would have elicited testimony from Martinez to contextualize the gunshot-residue test results and explain that an unreliable methodology was used, thereby casting doubt on the results.[2] In addition, the Government would in all likelihood have elicited testimony from Martinez that gunshot residue is not captured on certain fabrics easily and can be brushed off by running. Given the type of jacket Steele was wearing, and because the Government's evidence showed that Steele had been running after the shot was fired and before he was apprehended, Martinez's testimony would have provided multiple plausible reasons for why no gunshot residue was found on Steele's jacket.

Steele argues in his reply memorandum of law that testimony that an unreliable test had been performed would have bolstered his argument of an inadequate investigation.

---

the negative implications Steele argues should be drawn from the glove.
[2] While the Court cannot be certain what evidence would have been adduced, it is highly probable that the full scope of Martinez's findings and analysis would have been introduced.

Steele contends that "[i]f it was proved that the expert NYPD laboratory examiner had actually used the wrong test on the defendant's jacket, then the defense could have offered the jury reasonable doubt based on the mishandling of the evidence." (Criminal Docket, Dkt. No. 98, at 3.) Such a conclusion is possible, but the Court is not persuaded that it is substantially likely. A SEM was not used due to resource-allocation issues, so it is not at all clear that a jury would have concluded that the evidence was mishandled simply because a SEM was not used.

Moreover, Steele fails to account for the weight of the other evidence supporting the Government's case. In considering whether a petitioner was prejudiced by trial counsel's errors, the strength of the Government's case must also be considered. See Henry, 409 F.3d at 66. Courts must "bear[] in mind that a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 67 (internal quotation marks and citation omitted). Thus, the Circuit has considered the prosecution's case to be weak when the only evidence connecting the defendant to the crime is a single identification from an arguably suggestive lineup, see id. at 66, or when absent potentially unreliable eyewitness testimony, the probative value of the remaining evidence is

"limited at best," see Nolan, 956 F.3d at 82.

In the case at hand, the Government adduced multiple other pieces of evidence probative of Steele's guilt. For example, an eyewitness testified that he saw a man in a burgundy jacket point a gun, and the Government established that Steele was wearing a burgundy jacket. Additionally, while Steele was being chased, Officer Burgos saw a black object in Steele's left hand and observed Steele make a swinging motion across his body as he fled, followed by a metallic clattering sound. Officer Burgos then found a firearm near where he heard this sound. Furthermore, the shell casing that was fired by the firearm found by Officer Burgos was also found near where Steele was arrested. There was also corroborative surveillance video.

While some of this evidence is circumstantial, it is nonetheless strong enough for a jury to conclude that: (1) Steele possessed a firearm and had thrown it aside while fleeing from the NYPD; and (2) the firearm had been discharged prior to Steele's flight. The weight of this evidence -- particularly when considered in conjunction with the weak, and even damaging, nature of the unintroduced evidence at issue -- critically undermines Steele's argument of prejudice. Because Steele cannot demonstrate prejudice, his claim for ineffective assistance of counsel must fail.

## IV.  ORDER

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that petitioner Joseph Steele's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (United States v. Steele, No. 15 CR 836 (the "Criminal Docket"), Dkt. No. 84; Steele v. United States, No. 20 Civ. 1151 (the "Civil Docket"), Dkt. No. 1.) is **DENIED**.

The Clerk of Court is hereby directed to mail this Order to Joseph Steele, Register Number 73353-054, at F.C.I. Hazelton, P.O. Box 5000, Bruceton Mills, WV 26525 and note service in the docket.

Because Steele has failed to demonstrate a denial of a constitutional right, a certificate of appealability will not issue.

**SO ORDERED.**

Dated:    New York, New York
          4 June 2021

                                    Victor Marrero
                                    U.S.D.J.